I'm George Bruges from the law firm of Hoi Frina here for Lenore Rodriguez. Defense? Michael Kujawa from the law firm of Judge James M. Kujawa on behalf of the defendant METRA. Good morning. Good morning. First, let me thank you both for coming in early. We had a 10 o'clock first oral scheduled and it canceled on us. So if I were in charge, they wouldn't get another one, but that's just me. So thank you for coming in early. It's a fairly straightforward case but very interesting. So we don't look at our clocks or watches in this division, but we do appreciate it if you get to your strongest points first and argue them. So at any time, Mr. Bruges. Your Honors, may I proceed? Please. We're here because METRA violated the law. They violated a very important safety law, the Federal Employer's Liability Act. And because of their violation of the federal law, one of their employees, Lenore Rodriguez, was seriously injured. And as this court in Osby-Dixon v. Union Pacific Railroad said, when the railroad violates the FVLA, the injured employee is entitled to compensation for the harm that the railroad caused due to its violation of the law. The harm that METRA caused to Lenore Rodriguez included wage loss, and the jury was correct in giving her an award for wage loss. It included pain and suffering, and the jury was correct in giving her an award for pain and suffering, and it included disability. And the jury was wrong in not giving her an award for disability, and it's up to us here to try and correct that. The primary evidence that is really uncontested in this case regarding the level of disability that Lenore Rodriguez incurred because of METRA's violation of federal law is taken from Dr. Cole's testimony. Now, if you recall the record, when Lenore Rodriguez was hurt, she was ordered to report the next day to LaSalle Street Station, where she was taken to a room and made to fill out an accident report, and then the METRA supervisors took her to Dr. Hartsock, who is METRA's chief medical officer. Hartsock treated Lenore Rodriguez for a period of time, and when she didn't get better, ordered an MRI of her shoulder that showed a full thickness tear, and when Dr. Hartsock saw that she had a full thickness tear in her rotator cuff, METRA's chief medical officer, Dr. Hartsock, ordered Lenore Rodriguez to go see Dr. Brian Cole. Can we go through what testimony there is in the record at trial of disability? Who gives an opinion that there's a disability, and what is it? Well, in plaintiff's case, we start with Dr. Gates, who is my expert, and said that based upon his review of the records, before the accident, she was able to work as a railroad conductor, which required you to be able to function at the heavy level of work. Well, isn't there a dispute about the heavy versus the light level relative to the definition that METRA uses? There's a dispute in METRA's job description, because in METRA's job description, it says two things. It says, in order to be a conductor, you have to operate a railroad switch, and you have to be able to push at least 100 pounds. So, under the dictionary of occupational titles, and every vocational person in this case said, that the requirement to push 100 pounds is heavy work. Yet, for some inexplicable reason, in METRA's job description, they said that the conductor's job is light duty, and it's clearly not. And METRA's vocational person, Julie Bowes, METRA's 213 physical therapist expert, Raven, Terry Cordray, my vocational expert, all agreed that the requirement to push 100 pounds is heavy work. But didn't Ms. Raven say it was exert versus lifting? Well, in this case, what it is, is pushing. I know what it is in this case, as far as what Ms. Raven's testimony was. She said exert. Exert, right. And in order to operate a railroad switch, you need to exert up to 100 pounds to get the switch from one position to the other. And even at her best day, Lenora Rodriguez was never documented, after the accident, able to exert over 52 pounds. Is there any testimony that, post-accident, this plaintiff could ever exert the 100-pound force that's necessary to do the conductor's job? Zero. There is absolutely no evidence. Everybody who testified in this case said she could not. A follow-up question. So based on what you said earlier in response to Justice Conner's question, are you saying that METRA's job description is internally inconsistent because it's a light duty but part of the conductor's requirement is that you must be able to exert up to 100 pounds? Yes. It is internally inconsistent because not only does it have a job description, but that's generally accepted in the railroad industry. And Terry Cordray said that, and Julie Bowles said that, that the conductor, both of whom are vocational people that testify often in railroad cases, make railroad a subspecialty of their vocational practice, agree that a switch is 100 pounds of exertion. All right. Counsel, what does Dr. Cole say about the disability? Well, you know, Dr. Cole is, again, METRA's witness and METRA's doctor, and Lenora was ordered there by METRA to treat with him. And she did because she wanted her job and she wanted to stay on good terms with METRA. The first visit with Dr. Cole, Lenora was already off work, and Dr. Cole said, yes, you have to stay off work, you can't go back to work as a conductor. Dr. Cole said that of the thousands of patients he sees for rotator cuff, only about 10% are serious enough to need surgery. And Dr. Cole said that Lenora was serious enough for rotator cuff terror to need surgery. And the surgery he did was drill a hole in her bone, screw an anchor in there, and sew the rotator cuff back together. He had her off work for five months after the surgery. What did he say about her disability and her return to work? What did he say about that? At the very last visit with Dr. Cole, he said that she was limited to light duty, no lifting more than 15 pounds, and that was in 2008. But didn't he say that she didn't have any impairment that would have kept her from returning to the job? He said, I didn't know if she had one. I don't think Dr. Cole had the requisite facts of the job description. Dr. Cole was never told that in order to go back to work as a conductor, you have to exert 100 pounds. And I think Dr. Cole said that in his testimony, that he can't make an opinion on whether she can go back to work at a specific job as a conductor. Rather, he said, what I'm going to do at the last visit in 2008, I'm going to limit her to 15 pounds. But somebody took his deposition. You could have asked him that in his deposition, right? METRA took his deposition and presented his testimony. Counsel, let me ask as far as the definition of disability that's in the record. To enlighten a jury as to what is disability. I mean, it means different things to different areas of law, does it not? Yes. And what's the definition that we have to guide this jury in the record as to what a disability is? Well, one of the things is Dr. Gates' testimony, where he said the inability to do things, usually it's the inability to do work things. The Illini pattern jury instructions talk about loss of a normal life. Is that the jury instruction that was given in this case? It wasn't because under FELA cases, there's an outlier line of cases that say loss of normal life is, you can't give that in FELA cases, that the proper instruction to give is the disability instruction. And that's why we gave, and if you look someplace in the record, we may have discussed that during the jury instruction conference, whether we should give the loss of normal life versus a disability. It wasn't in the FELA instruction for the federal court, though, the loss of normal life. Is it not? It may be an Illinois case, but there is a case that says that in FELA cases, you have to use disability, you can't use loss of normal life. In the Seventh Circuit pattern instructions, they don't usually do itemized verdicts, and they have just a general listing of things that you give an award for damages, and they include pain and suffering, loss of normal life, disability. There is a jury verdict for loss of normal life, or instruction for loss of normal life. It includes it. Right. But there is, I think it's an Illinois appellate court case that says you can't use disability in FELA cases. I mean, you can't use loss of normal life. Have you read that case? No, I'd have to look at it. And why aren't the jury instructions in the record? We couldn't find them. I know we supplemented the record about four times in this case. But there was an agreement. I saw that order. It was interesting. They agreed to supplement the record but crossed out, and I think it was your initial, not to include the jury. It may have been because they couldn't find them. I remember being on the eighth floor at the Daly Center, and they usually take the jury instructions and put them in a separate spot so that they make sure they're part of the record. And we went and had the clerk, Mr. Goggins, I think, went with me and actually looked in the drawer to see if the jury instructions from this case were there, and we couldn't find them. All right. Continue. So one of the cases that the railroad relies upon here is this case of Balo versus METRA. And it's very interesting that the railroad would rely upon Balo because what happened in Balo was the jury awarded him $500,000 for wage loss, zero for pain and suffering, and zero for disability. And METRA appealed it. And METRA's position on appeal in Balo was that the Illinois Appellate Court should adopt a per se rule that when there is an award for wage loss and no award for pain and suffering and no award for disability, that that should automatically be reversed and sent back so that the plaintiff can get more money. And I represented the plaintiff in Balo, and in our brief, we said that's fine. You can send this case back for a new trial. Keep the $500,000 wage loss claim and send it back for a new trial on pain and suffering and disability. The Appellate Court declined and basically wove together the Snover case in Balo and said it's a fact-intensive investigation. Whether a person who gets zero for something like pain and suffering or zero for something like disability should get a new trial on that element of damages. And you look at the cases. So Balo was a lot like Snover. In Balo, it was not disputed that he had significant wage loss, but his evidence on pain and suffering and disability really wasn't there. He said he never had any pain and suffering from this visual migraine he had, and the disability was really minimal because he kept playing golf. He jogged every day. He took care of his kids and did everything he would normally do except he couldn't work. And the jury said based upon those facts, those specific facts that were really a lot like Snover, there wasn't much evidence of disability and pain and suffering in Balo. So what's the standard of review on inconsistent verdicts that we should be looking at? I knew you were going to ask that. We have it as the very beginning of our brief. And I think that it's de novo. I think it should be de novo. For instructions? For inconsistent verdicts. Oh, inconsistent verdicts. Oh, I'm sorry. All right, let's take a quick review on that. Let me ask you, what's the standard of review for against the manifest weight of the evidence as far as a new trial? I think that should be de novo too. Does the Dixon case really have to do with inconsistent verdicts or is that more of a manifest weight case? Well, it's really that the jury ignored a proven element of damage is I think the way they describe it in that case. And the Dixon case is a very similar case to this. Well, but again, it's a manifest weight case. It's not an irreconcilable verdict case. So do you have a case, do you cite a case that talks about inconsistent verdicts other than Dixon? Well, you know, not in this specific situation where the jury ignored a proven element of damages. There's some business cases out there where there was inconsistent verdicts that we do cite that, you know, give the general standard. Mr. Briggs, can you tell me, you know, in as simple terms as possible, why you think, articulate for me. I know you said a few briefings. I didn't read it. But why do you think this verdict is inconsistent, bearing in mind that there were other facts that the jury, they heard two separate arguments as to whether she was disabled and whether she wasn't. And then they resolved it in favor of Metro that, no, she's not disabled. So tell me why they're wrong. And they're wrong because they ignored Dr. Cole's uncontradicted, unimpeached testimony that if nothing else, there was a limited period of disability from when he did the surgery in August until he released her back to work. I'm sorry, when he did the surgery in January until he released her back to work in May. And there's no question that for the first four or five weeks after that surgery she was in a sling with a cushion and she had absolutely zero use of her arm. She had to sleep in a recliner. She couldn't take a shower. She couldn't wash her hair. Okay, so you're talking about disability before the time of trial or continuing disability? Because that's a little unclear from your argument. Like what period of time are we talking about in terms of the disability? At one point I thought you were talking about continuing disability, that they didn't, the jury didn't award her anything and she's clearly disabled according to your argument. Well, I guess, and let me clarify that because it may be unclear. The evidence at trial was that she had a continuing disability because the last functional capacity evaluation showed that she could only do median, at best, medium work when before the accident she could do heavy work. But the way that the Osby-Dixon case looked at the disability and what the appellate court said in that case as far as giving them a new verdict was that although permanent disability may be in question, there was undeniably a period of disability from the time of the accident until the doctor released Osby-Dixon back to work after the surgery of one year. But that was agreed in that case that there was a disability. It's contested in this case though, right? I don't think it's contested. They put on Dr. Cole. And Dr. Cole said that there's no way this lady could do anything for that five or six months between the time he did the surgery and the time he released her back to work. So did he say that was a disability? He didn't use the word disability, but he went through all the things that she couldn't do. She could have no use of her left arm. She had to use a size machine. She was on Vicodin for pain. How does the jury know that that's a disability? I'm just asking the question. You know, the way I describe it in closing argument usually is that pain and suffering is something that the defendant gives you that you don't want, and disability is something that you want and they take away from you. That's not evidence. What did the jury have to rely on as to what the definition of? That for that period of time that Dr. Cole testified that she was not able, she was disabled from doing all the activities of daily living other than with her left arm, keeping it in a sling, that she couldn't work, that Dr. Cole said she couldn't work, that she had to take Vicodin, she had to be in physical therapy, you know, she had to keep her arm in the sling. And her testimony was that she slept in a recliner, she couldn't shop for her family, she couldn't wash her hair, she couldn't take a shower. Counsel, don't you think the plaintiff's testimony was maybe questionable because of her misrepresentations or fudging, as it was called in the record, on certain applications and maybe they didn't find her to be a credible witness? And I agree. And I think what happened was METRA would not let her go back to work. It's undisputed in this case that she tried and tried and tried. Every time she saw Dr. Cole, she said, I want to go back to work. When she had the second FCE, she sent it to METRA and said, now will you let me go back to work? And METRA still wouldn't let her go back to work. Doesn't that suggest that she's saying I don't have a disability if I want to go back to work? Well, and that's what they argued. They kind of twisted it. But she never said, I am disabled. She never said, I'm not disabled. She said, I went to the doctor, I went to the FCE, and this is what the medical provider said. And she took that information to METRA and said, based upon this information, now will you let me come back to work? And every time she did that, METRA said no. Other than for that short period of time between May of 07 and January of 08, when she worked as a conductor, with continuing visits to Dr. Brian Cole and prescriptions for Ultram and Celebrex so that she could sleep at night and leave her shoulder pain. But did METRA not let her back to work because of her absences that were unexplained or unexcused versus a disability? This is not in the record, but I can tell you what happened. Not only if it's in the record. No. What happened was that METRA never let her go back to work because she never passed the physical that would let her meet the job requirements as a conductor. And that's why she never went back to work. Mr. Brugess, I'm still confused about the answer to my question. Are you complaining about the lack of damages for the disability that she suffered between the time that she had the injury and when this trial took place or lack of damages for disability going forward or lack of damages for any disability? I mean, it's not clear to me what period you're talking about. A few minutes ago you talked about the five-month period when her arm was in a sling and she couldn't wash her hair and all of those periods of time. I think it's really clear that during that period of time there are certain things that she clearly could not do that would likely qualify as a disability. So are you talking about that period of time or today going forward? Justice, I'm going to be honest with you. I'm trying to fit this case into Osby-Dixon where the appellate court sent it back. I think it would be good to just stick with the facts of your own case and let the facts lead the case where it goes. But in Osby-Dixon, the reason the appellate court sent it back was because they said there's an undisputed period of disability. And when they sent it back, they sent it back and didn't limit the damages. So I wanted to make sure that... At least you're honest about what you're trying to do. I still need an answer to my question because that's helping me to analyze your argument, to know what period of time are we talking about. Clearly from August until May, August when the accident happened, until May when she was released to go back to work, and even taking that as a subset from the surgery in January until May, those were periods where it was undisputed in this case that there was disability. And in closing argument, like in Dixon, the defense alluded to that, that she may have some element of disability for that period of time when she had her arm in the sling. And that's what they said in their closing argument, which is not exactly what they said in the other case, but it's close enough as an acknowledgment that for that period of time that there were many things she was not able to do that qualify as disability that the jury ignored. And, you know, this is not a Balo case or a Snover case where the evidence is kind of nebulous about what the disability was. Here we have a lady having a serious surgery, hardware put in her shoulder, and many months of extreme disability. And this case qualifies, like the Dixon case did, that that's something that the jury could not ignore. We'll have five minutes for reply. Can I ask one more question? Can we get to the 213 issue and the lightness? And honestly, every time I had to read Judge Flannery, that colloquy with him was very painful because I remember that and just feeling like a piece of burnt toast because I thought I was wrong and I honestly thought that Mr. Kajawa had not asked those questions of Dr. Gates and that I had misheard. But when I got the transcript, you know, and as we said in our brief, it's very Kafkaesque in that I could ask questions, go through my direct, not touch on at all this FCE that was in June of 2009. Cross-examination. Take part of the FCE results that I thought were misleading and misleading to the jury and got my expert to admit that maybe she was rehabilitated. And then on redirect, which 213 doesn't apply to. You know, 213 only applies to direct testimony. And, you know, the rules of evidence, Illinois rules of evidence say that once he gets into a portion of a document, that I have a right to get into the rest of the document and redirect in order to explain the part that other opposing counsel alluded to. And, I mean, it was just wrong not to let me do that. And I think that seriously affected the jury in this case. That document went to the jury, did it not, the FCE? No. I don't think any of the medical records went to the jury. It was not admitted? I don't think we sent any medical records. Generally speaking, when we try these FELA cases, I'm fairly confident that no medical records went back. Going back to Justice Conner's previous questions, though, our standard of review on the admission of evidence is abuse of discretion. So I'll try to explain this. Apparently, I don't want to say yelling at you, but forcefully describing that he thought it was bad form to not disclose this document, not even to the defense, but to your own expert, right? He had never seen it either, right? What had happened was that was actually their 213F3 expert. They hired Raven as a 213F3 expert. And we agreed to produce her for an FCE with Raven, hoping that it would let her get back to work. And I made the mistake of, when we got that in, not immediately forward. Well, actually, I did forward it to Dr. Gates, but not telling them that I had forwarded it to Dr. Gates. So I never, even though Dr. Gates had looked at it, and they knew about it because it was their expert's report, I never told them that I let Dr. Gates look at it. And that was a serious mistake on my part. But my question was abuse of discretion, right? So it would be preferable, I'd suggest. I would agree with you that, well, once they choose, it's up to them. You leave it out of your direct. They say, well, I want to take the chance. I'm going to cross. I think this will be effective. So they cross your expert with their expert's report, which you left out. Correct. And now you say, well, I get to redirect, for whatever reason, because now it's in. And Judge Meyer says, no, I'm not going to let you. Isn't that within his discretion? I think it's an abuse of discretion because the reason he gave, he applied 213 and said, because you didn't disclose this in 213, I'm not going to let it in. And that's really the only basis he gave. What about the rule of completeness? Didn't he use that as well? The rule of completeness, again, he was in error because, if you read the record, there was a misunderstanding whether or not Mr. Kajawa had actually used that document and referred to the portions that I thought that he did and that the record proves that he did. And Judge Flannery said, I don't remember him asking those questions, so under completeness, I'm not going to allow it. He didn't like it that you were telling him he wasn't fair, did he? I hope you guys don't get mad at me because I still don't think it was fair. We read this with an objective eye. Right. I mean, it was very misleading to the jury for my expert to say, yes, based upon that functional capacity evaluation, she could go back to work at METRA, when the conclusion was she couldn't operate a switch without help. Well, you make an argument in your brief that you felt that the judge's, at least that's the inference I draw from the argument, that the judge's refusal to let you redirect left the jury with an unanswered question that was really damaging to the plaintiff. I mean, that's basically what you said. And Dr. Gates was the main medical witness that I called in my case in chief. And Mr. Kachaur very artfully got Dr. Gates to say that Ms. Rodriguez, after having looked at that one portion of the FCE, probably could go back to work at METRA as a conductor, which kind of pulled the rug out from my vocational testimony and pulled the rug out from my economist. But didn't you say METRA wouldn't take her back as a conductor? Well, under the FELA, the damages, economic damages generally are not, in many cases are not wage loss, but loss of ability to produce income. And so the theory is that even if METRA won't take her back, if she was fit, that she could go to Norfolk Southern or another railroad and get a job, which she tried to do. And so if she has this conductor experience, and the railroads right now are hiring conductors, they're looking for conductors and hiring them, that theoretically if she was not injured, if she didn't have this disability in her shoulder, and this is what my vocational economist said, that then she could go to another railroad and get the job, but that the loss, even though METRA wouldn't take her back, she still had this reduction in her earning capacity, pre-injury, post-injury, because of the injury. How did this whole 213 thing come up? Because she was talking about on the FCE, it said something about her, she was using the phone and driving at the same time. Well, they did. But that's what it was about, generally. No, it was, I mean, to a point, yes, about her shoulder, but it was really the very specific thing that we talked about at the very beginning, and that is METRA's job description is internally inconsistent when it says that if she can qualify for light duty, she can go back to work, but she has to be able to exert up to 100 pounds of force. Well, I'm looking at the testimony of what you say was the damage to your client, and the question is, now, if she, I'm sorry, doctor responds, well, that's pretty strong. She was really backing up and talking on the cell phone at the same time? Yes. You would have to question it. He doesn't say, unequivocally, I changed my mind, does he? No, but it's in the other part where it's earlier, we cite the part where they ask Dr. Gates, they give him the FCE from 2009, June of 2009, and say, here it says that she could do 40 to 50 pounds of exertion and that she qualifies as a conductor, so she can go back to work as a conductor, and Dr. Gates says, yes, that's what it says. And so all I wanted to do was come back and say, well, Dr. Gates, look at the last paragraph where it says she can't throw a switch, and she can't throw a switch, she can't be a conductor, and that's what Judge Flannery wouldn't let me do. So it was just that very small area about part of it saying she could do 40 to 50 and then at the end she couldn't do 100. And did the defense attorney use that in argument? In closing argument, yes. Even plaintiff's own expert said she could go back to work as a conductor. You'll have a couple of minutes for your question. Thank you. Good job. Good morning. Good morning, Justices. Good morning. Let me preface this by saying that I don't believe there were any errors, either in the jury verdict in this case or by Judge Flannery in his evidentiary rulings in this case. But both of the errors that plaintiff claims occurred in this case, plaintiff's counsel is directly responsible for. Plaintiff's counsel asked this court to overturn the jury's verdict because of a zero damages award on the disability element. Yet plaintiff's counsel in his closing argument told the jury that they could award zero in damages if they saw fit. After asking the jury to return a verdict form A, plaintiff's counsel said, and I'm quoting from the record, how much do you put on verdict form A? That burden is in your hands. You have complete control over that. You can give nothing. You can give what I recommend. You can give what Mike recommends. You can give double what I recommend. It is completely within your control. Now, plaintiff relies almost entirely on the Dixon versus Union Pacific case for the overturning of this verdict on the disability issue. But this case is really the exact opposite of Dixon. We've never conceded disability in any way, shape, or form either in the presentation of the evidence or on closing argument. Which witness testified on either side that Ms. Rodriguez could exert 100 pounds of pressure by pushing switches after her injury? I don't believe there was. Right. There weren't any. And did Metro take her back? Metro took her back for a short period of time. Is that right? She came back for a short period of time after her surgery. And after that, Metro would not allow her to return to work after that because she was unable to perform what Metro needed her to do, which was throw switches. Is that right? I think that was a very hotly contested issue in the evidence in this case. So Metro never told her she could not report to work, that they were willing to employ her as a conductor? She just walked off the job? No, Metro never passed any of the functional capacity evaluations. So she wasn't allowed to return then or stay as a conductor after she failed the railroad's test, the FCE test. Is that right? That is correct. So the railroad said, something's wrong with you physically. You cannot come here anymore. And they went to trial and said, well, we won't let you work here anymore because you are disabled. We're denying that you're disabled. We will not allow you to work for us because you cannot do this job physically anymore, which you were doing until you got injured. But we're denying that. What were they denying? I think that was Plaintiff's argument at trial. I think the position of Metro was that Plaintiff could do the work. She could exert 100 pounds. She could. Even though no witnesses, including your own, said that. Well, every time she went and took a functional capacity evaluation, we had an evaluation that said she's not exerting full effort. She's not performing the test properly. That was the problem with Kathleen Raven. Kathleen Raven, during her functional capacity evaluation, said this is the best that she can do when I test her. But there are so many inconsistencies within the testing process, within her responses to the tests, within the test results themselves. She noted that there's – She said she could possibly do between 42 and 53 pounds, was that, I think, was Raven's theory? But what Ms. Raven eventually concluded was that the functional capacity evaluation was invalid because, based upon the Plaintiff's actions and responses to the tests, she felt that she could do much more. But she was not putting forth full effort. And what would the much more be, 100 pounds, 90 pounds? I mean, there is no testimony in the record as to the fact that she could throw a switch at 100 pounds of force, which is what is required for the job, isn't that right? Well, I think there is a distinction within the record in terms of what is exactly required for the job. The job requirement says 30 to 100 pounds. And I think the reason that's there – you asked the question earlier about whether that's internally inconsistent. And I don't believe it is because every switch is going to be a little bit different. And perhaps certain switches – Okay, so let me ask this hypothetically. If she is required to throw a switch that requires, say, 90 pounds of force or 100 pounds of force, could she do it? Well, I – According to your own expert. According to our own expert and based upon the results of the functional capacity evaluation, we don't know. She wasn't able to do that in the testing process. But the therapist, Kathleen Raven, said – You don't know? What do you mean you don't know? What did your expert say? She said that the best she could do on the tests in the June 3, 2009, functional capacity evaluation was the 43 to 52 pounds. So that's what your expert's testimony was. So how can you say you don't know? Because I think that's not all of the testimony of our expert. What Kathleen Raven said was, I think she can do more. I don't believe this is a valid functional capacity evaluation because I don't believe I'm getting a valid effort from the plaintiff. And so – How long is an FCE? How long? What's the duration of that kind of test? Is it a half hour? Oh, no, I think this one was about six hours. And there was a lunch period built in. So there was a long testing process. And one of the things that happened when Kathleen Raven was testifying was, it was pointed out that she wrote into her report – it's over a dozen if not 20 times – inconsistencies between what plaintiff can do when being observed and what plaintiff can do when she thinks she's not being observed. I mean, this is the functional capacity evaluation where just before she left the evaluation at the end of the day, plaintiff had told Kathleen Raven, I can't drive with my left arm. The pain in my left arm is eight of nine out of ten on a pain scale. And yet Kathleen Raven – and I think this is very telling – that Kathleen Raven goes and watches the plaintiff pull out of the parking lot to determine whether she's getting accurate information because Kathleen Raven had already determined she wasn't getting it in the functional capacity evaluation. And Kathleen Raven observed the plaintiff driving out of the parking lot, steering with her left hand while talking on the cell phone with her right, which completely contradicts both the complaints of pain, the level of pain, the type of activity she could do. I mean, Mr. Bruges said here that it was undisputed that Lenora Rodriguez  And I completely disagree, and I think the evidence completely discounted that argument. Because I think what the evidence showed in this case, when you look at all of the inconsistencies – She never tried to come back to work at METRA? I think she did the minimum required. When METRA sent her to a doctor, she went to a doctor. When they sent her to a functional capacity evaluation, she went and showed up at the functional capacity evaluation. But she never intended to return to work. How do you know that? I think it was clear to the jury, based on all of the inconsistencies in her testimony, based upon the inconsistent complaints to the various doctors. The fact that she applied everywhere, including other railroads to do heavy work, then lied on the applications to indicate she was very healthy does indicate she's a liar. But the stronger inference is that she wanted to return to work, isn't it? I think had she wanted to return to work at METRA, she could have gone and given consistent effort. And what? What could she have done since she cannot lift 100 pounds? What could she have done? She could have given consistent effort on the June 3, 2009, functional capacity evaluation to have a valid testing of what her efforts are. Which still, there's no reason to believe it would be 100 pounds. Ravens does not suggest for a moment that she thought she could, that Rodriguez could lift or exert 100 pounds. Did she? I think Raven was left with the conclusion that I'm not sure what this woman can do, but based upon her tests, her actions, and the evaluation I've done in this functional capacity evaluation. How about the period when she is in a sling? From the time the doctor, your doctor, looks at her and says, all right, you're going to have to return to work, come and see me, and seven months later, whatever it was, all right, fine, we'll take a flyer, we'll try to have you come back. All right, was she disabled during that period of time? When your doctor said, no, don't come back to work, you can't come back to work? Well, I think, and one of the things that I was very careful in my closing argument, because I was not conceding disability in any way in this case. I did concede that there was an element of lost wage there. She was off work for a nine-month period of time, and the number the jury gave was almost dollar to dollar what we told them she lost during that time period, and she did have surgery. So why did she lose the wages? It's true that your expert, Gary Skoog, testified that she had $31,111 or 112 in lost wages, and the jury gave her $32,000, but that was based on what? It was based on what, in your opinion? It was based on the time period that she was off of work. And she was off work because of what? Because of the shoulder surgery. But when you look at the disability, what we had in this case, and I disagree with Mr. Bruges, I don't know of any case law in Illinois. Well, I do, counsel, that's why you're here. Well, but on this particular point you made in his argument, I don't know of any case in Illinois which says that in an FELA case you cannot use loss of a normal life as opposed to disability. Plaintiff's counsel chose to go with the disability element, and it's not defined in the IPI. Could have used loss of a normal life and gotten that IPI instruction, but he didn't. So then the jury's left to their own life experiences in terms of defining disability, or who defines disability for them? Why wasn't there a description given to the jury as to what constitutes a disability? There was. There was by plaintiff's own expert. Dr. Gates testified that that was the only definition of disability given to the jury in this case. Right. And what Dr. Gates, his definition was, the inability to perform certain actions usually in regard to their work status. Right. And so it seems to me that if that was the definition, is there any testimony that shows that during the entire, that during at least a portion of this period of time, this plaintiff was unable to perform some function relative to her job? I mean, isn't there testimony that supports that? She couldn't perform the essential elements of her job during the period that her arm was in the sling after she had the surgery when she couldn't. I mean, I don't think anybody was testifying that she could do the job during that five-month period. There is no doubt from the time period when she was taken off of work after the injury and was off until May of 2007 when she returned following the surgery. But when you look at, this is the foundation the jury had, was given in this case to decide this issue of how much to award for disability. They had Dr. Gates whose definition equated disability with no work. They had Mr. Bruges on closing argument who said disability is what they take away from you and what they took away from her was her ability to work. And when you look at Dr. Cole, the surgeon, he said after rotator cuff surgery, people can do pretty much whatever they want except active motion of the shoulder. Didn't Dr. Cole also say that they can expect that they would have some limitation on their physical activity, possibly forever? Well, certainly there's a possibility depending upon the recovery here. But what Dr. Cole said, what happens after this rotator cuff surgery? Dr. Cole's quote was, someone after this surgery, like the plaintiff, can do pretty much whatever they want except active motion of the shoulder. And we had a, there was hardly any evidence and really the only evidence came from plaintiff and I think that her credibility was so questionable after all of the various inconsistent statements that she gave both on job applications and to her doctors and everything else. But she said during the time when she, after the surgery, she said it was hard for me to go shopping. But really what she ended up saying was I have to lift the bags with my other arm because I can't lift them with my left arm. And she said I can't, I have a hard time washing my hair. But she acknowledged that she could wash her hair with one hand. When you take that, but that was pretty much it in terms of what she could not do, even in that limited time period. Well, wouldn't that indicate why they didn't ask for the loss of normal life as opposed to disability? I'm sorry, I didn't hear that. Wouldn't that support their theory of the case to not ask the jury to decide how much she should be recompensed for loss of life, loss of natural life when she didn't suffer much of a loss of life. She just couldn't go to work as a conductor. I think that the things that she did testify to, if the jury was going to believe them, certainly fit better into the definition of loss of a normal life. The inability to do certain things that you used to be able to do before than it does into disability. Because what we had here, every other thing that she testified to or that they complained about falls into the other category. The fact that she was on medication, that's pain and suffering. The fact that she was off work, that's lost wage. And that's what the jury did here. They looked at the definition of disability and they looked at Dr. Cole's testimony that they can do pretty much whatever they want. Well, it seems to me their theory of trial was that she was unable to return to Metro because Metro would not let her back because she was disabled. And that's what they're arguing in front of us today. And for you to argue in front of us today, well, they should have argued this other. Well, they didn't. So as Justice Cunningham says, let's get back to what we have in front of us. Describe what happened with the 213 disclosure of your expert's report. Sure. Dr. Gates was the initial disclosure came sometime before, I want to say, the end of 213. And he was deposed. And after the time of his deposition and the time of trial, there was an FCE done, but there were other medical records and other doctor visits. And those were all given to Dr. Gates. And at trial, Dr. Gates came in with a new update. What Dr. Gates does is he does a chronology of all the medical records, and that's one of his exhibits that he testifies off of. And the only, prior to Dr. Gates getting up on the stand and beginning his testimony, the only chronology we had was the one that ended in December of 08, with no 2009 or anything else thereafter. During Dr. Gates' testimony, it became apparent to me that there was a new exhibit that had been given to Dr. Gates and that they were intending to ask him about. And this contained, I think, seven additional records, including Kathleen Raven's June 2009 functional capacity evaluation. That is a clear violation of 213. And I objected, and that objection was, I think, properly sustained. Now, on cross-examination. Now, was there a sidebar about this, how far it should go, or what things Dr. Gates couldn't testify about? Was the doctor then told, by the way, don't go into anything from the time, don't mention any reports or any conclusions you draw from a report after your last report was given to the railroad in 2008? There were several sidebars during when we were making these objections. And really, there was an attempt by Mr. Brugis to continue to get in the updated chronology. And after our repeated objections, Mr. Brugis just said, okay, fine. I'm just going to use the old chronology. And I'm not going to ask any questions about anything on the new chronology. Okay. And he gets done, the doctor is done, or Mr. Brugis is done on directing you going to cross. And when I cross-examine Dr. Gates, as I am entitled to do under 213G, I can question him about records that perhaps he hasn't reviewed, although in this case I was questioning him about records that he had reviewed. Right. Actually, reports that your people had generated.  It wasn't like you weren't aware of the reports. There were your reports. Oh, I knew about the reports. In fact, I was, as a trial approached, I had checked a few times because I was really unclear why there had been no 213 update, no 213 supplement. And it was never mentioned, like I say, until Dr. Gates was on the stand. But then you cross on this report that you had, he had. I cross-examined him. Gates had reviewed. I used the functional capacity evaluations. I was very limited in what I did. I questioned him directly out, because I had the functional capacity evaluation here with me. I questioned him directly out of the functional capacity evaluation, three specific areas where I asked him, does the functional capacity evaluation demonstrate that the plaintiff has a higher level of functioning than required to perform the lifting requirements of her job as a conductor? Yes, it did. And what was the answer from Dr. Gates? He said yes. Okay. Now, going back to that, from minute one, we've been saying you have to lift or exert 100 pounds to have a job as a metric conductor. So when you ask then, as you are arguing now, that the FCE report indicates that she can do the job as a conductor, how is that so when no report says she can lift 100 or exert 100 pounds? Because the job description says 30 to 100 pounds, and the functional capacity evaluation, and with all of the inconsistencies in the records, indicate that she can do more than she is showing. So when you ask the question, so when he gives the answer, yes, it does. When it did not, there's no report. The best you can hope for, I would suggest, Counsel, is that the answer from Gates would be, well, I don't know, the report says she's malingering, so nobody says she can lift 100 pounds. Instead, you ask the question, which you just read, which is found at page 13 to 14 of your brief. And so your suggestion is, well, that was true, even though 10 to 30 pounds was the question, and the answer is yes, 10 to 30 pounds, when the truth is 100 pounds, or I say more accurately, because nobody's a liar, and I mean that. That was okay, which is okay, because it doesn't violate 213. You're allowed to do whatever you want with these reports, since you had disclosed them and they had not. Now come times for redirect. How is it they should not be allowed to ask the questions I'm kind of yelling at you about? Why is, isn't it 100 pounds, not 10 to 30? Why is that wrong? How is it okay that Judge Flannery said, no, I'm not going to let you ask that question? Because that's what 213 says the rules are. Cite a case that says, in a 213 violation, you are absolutely allowed to cross. Actually, neither one is. One case between you for a redirect after a cross on 213. There is no case that I'm aware of. I looked and I couldn't find one, but the committee comments for Rule 213 talk about, under Rule 213G, talk about the fact that there is no requirement for disclosure on the cross-examining party. And in the committee notes, it says, the exception to disclosure under Rule 213G is limited to the cross-examining party. It does not excuse the party calling the witness from their duty to supplement under Rule 213I. And that's exactly what Judge Flannery said. But does that say then they can't redirect? Well, if that was the way the rule was going to be applied, then that would be encouraging a lot, I believe, of technical gamesmanship. Because if I had a report with my expert, all I would do then was I would give my expert only the documents that are 100 percent in support of his opinion. Because then I could say, well, you know, I'm not going to ask him any questions about anything that might be able to be used for cross-examination. Well, I understand the principles. You won't find a more stalwart defender of 213 than me. All you have to do is look at the reported decisions. Clayton, et al. I mean, I'm real for it. But, again, your suggestion is not that Flannery was exercising his discretion, but he couldn't. That Flannery, had he wanted to, he could not have allowed redirect action. Well, I agree 100 percent that it is Judge Flannery's discretion in this case. And he did not abuse his discretion here. But I think that this is the proper reading of Rule 213. I think he was correct in his interpretation of Rule 213. To allow this would allow the party who is the proponent of the expert to withhold from the disclosure any documents that they think, well, you know, we'd like to get a little bit from him on this, but it opens them up to cross-examination on that. And then puts the burden on the cross-examining party. Well, do I take the risk of opening the door? Because I know if I ask one question about this, then they can come in and elicit as many opinions as they want, whether they're disclosed or not. So when you decided, and you're the trial lawyer, you decided, you were making the decision on cross. Should I cross this doctor based on this SCE that I know he read? My guy tenured it, every guy tenured it. But I was never told he read it until just now. Should I cross him? Was your theory that they won't allow him to redirect on it? Or did you know in advance he wasn't allowed to redirect on it? I honestly wasn't sure what was going to happen. I was surprised that there had not been a supplemental disclosure. Well, they're wrong. Right. They're wrong. I'm just asking as a trial tactic, having done that for a long time. Your decision was I'm going to ask that and take that chance that he's going to allow him to redirect because you really wanted to get that SCE in through their expert in addition to your own expert. Yes, I was going to take the chance. I was planning on cross-examining him using that document. But I don't believe that that allows then the party who propounds the expert to then, they can come in and ask anything they want and elicit any opinions undisclosed. Even if the impression is frankly what I would characterize as false. And it's false characterization. So when you ask the doc, Gates, it's 10 to 30 pounds, and it's actually 30 to 100 pounds, that's okay. They're not allowed to try and correct that misimpression. Well, first of all, I do not think I misled Dr. Gates. I had carefully crafted questions. Does the functional capacity evaluation indicate, and it's right in the functional capacity evaluation, it says right here, this demonstrates a higher level of functioning than required to perform the lifting requirements of a job as a conductor. Dr. Gates had reviewed this. Which are actually, though, that's what the report says. I'm not saying that, Dr. Burke. Right. But the lifting requirements of the job are 100 pounds. Is that correct? Well, no. The job description says 30 to 100 pounds. So somewhere in the manual it says this. But as a practical matter, is it not 100 pounds? As a practical matter, they're not going to let her work as a conductor. Answer my question, and then you can make your, are they going to let her back in if she can't lift 100 pounds? Well, they didn't. No, they're not going to. There you go. But that was not my question of Dr. Gates. And this is cross-examination of an expert. But, counsel, let me ask you another question. You just talked a few minutes ago about the potential for gamesmanship if the rule were interpreted another way. How does that not apply to what you just did? Or how you used, when Justice Quinn asked you, were you, did you know what the judge was going to do in terms of allowing them redirect? And you said, no, you didn't know what was going to happen, but you decided to open the door anyway. I mean, how is that not the same kind of gamesmanship that you were just condemning a few minutes ago? Well, it seems to me that that interpretation would really turn the burden of 213 upside down. It's the party that is offering the expert that can talk to the expert, that can develop those opinions. And they have an obligation to supplement. I prepared a cross-examination not thinking that apparently they weren't going to use these documents. And so I had a decision to make. But I had no idea how Judge Flannery was going to rule on redirect. I certainly did not believe that 213, just because I asked a few pointed questions about a document, allows Dr. Gates to come in and give undisclosed opinions and have free reign to talk about everything within the document. I took a calculated risk. And I don't see that as gamesmanship. I see that as trial preparation. But then you argued it as well, did you not? Did you not argue that Gates' testimony was that she could physically perform the necessary acts required of a conductor by Metro? According to the job description, yes. There you go. And Dr. Gates was all of the evidence in this case, every single witness that testified. The evidence was hotly contested. The credibility of the witnesses was questioned by both sides. And it was a hard-fought trial with every single witness and every single piece of evidence. And the jury had the opportunity to evaluate all of that and then make their determinations. It was a credibility case. I think if you look at the cases we cited, you know, this is just like Snover. Well, Snover was $330 in medical. All right, this is tens of thousands of dollars. I'd suggest Snover's. I know every site because it's our Supreme Court. I'd suggest it's worthless in terms of disability for getting a Band-Aid. I would hope it would be no disability. Do you have anything else? Counselor, can I ask you, was the FCE, this June 091, ever published to the jury or admitted in evidence? Yes, yes. I think there was some confusion as to whether it was sent back into the jury room when they were deliberating. No. When Kathleen Raven testified, the Functional Capacity Evaluation was admitted into evidence. It was published to the jury. She was questioned extensively about it on direct examination. Counsel got a full and complete cross-examination of not only her, the author of the Functional Capacity Evaluation, but Julie Bowes, our expert, he questioned her about it, too. So in terms of was it error, did Judge Flannery abuse his discretion? I mean, if there was any error with this 213 issue, it was harmless error at best. And I'm certainly not conceding that there was error, but harmless error when the Functional Capacity Evaluation was admitted into evidence in defendant's case, which was testified to and cross-examined on at length in defendant's case in chief. Thank you. Thank you very much. Very briefly, Mr. Bruges. Thank you. I'd just like to correct a couple of things that Mr. Kajawa said. One of the things he said was that every FCE showed that she was faking, and that's not correct. There's two FCEs done in this case. The first one was done by an independent treating doctor, Dr. Smith, and an orthopedic surgeon on the south side in Ridge Rehab that found that she was a valid FCE. Every valid score was in her favor, that she gave full effort. And that was in 2008. She could only do light duty. And she worked hard in physical therapy between this 2008 and 2009, and she testified, and I believe she tried her best at the 2009 FCE. The difference was it was being done by their expert. And their expert testified that she didn't think so, unlike what Ms. Rodriguez's lawyers thought of Ms. Rodriguez's effort. The expert's theory was that, no, that wasn't much of an effort, right? Correct. And then that was in June of 2009. In July of 2009 is when she sent the FCE to Metro and said, I went to the FCE, you ordered me to, can I go back to work? And she was not permitted to go back to work. The only other, I think, important distinction is that as far as Dr. Gates' redirect, nobody was asking him for opinions on redirect. It was just really to go through the document, and counsel pointed out part of the document, said, doesn't the document say this? I didn't want an opinion from him. I just wanted him to say, doctor, look at the conclusion, and doesn't the document say that? And that's all I was asking for, not an opinion. Lastly, I have just one question. You asked for disability, and you asked the jury, when you argued in front of the jury, that you were asking for 36 years' worth of disability at $10,000 a year. Is that right? So your argument was that while she was disabled, it wasn't like she was a complete disability, she didn't lose her arm, it would come to essentially a work lifetime of $10,000 difference in employment, the possible wages of $10,000 a year. Thank you. This case will be taken under advisory.